**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **Lattice Technologies LLC,**<br>Plaintiff,<br>v.<br>**BLACKLINE SAFETY USA CORP.,**<br>Defendant. | Case No. 1:25-cv-00108-JLH<br>Patent Case<br>Jury Trial Demanded |

**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

1. Plaintiff Lattice Technologies LLC ("Plaintiff"), through its attorneys, complains of BLACKLINE SAFETY USA CORP. ("Defendant"), and alleges the following:

**PARTIES**

2. Plaintiff Lattice Technologies LLC is a limited liability company organized and existing under the laws of NM that maintains its principal place of business at 1209 Mountain Rd., Pl NE Ste n, Albuquerque, NM 87110.

3. Defendant BLACKLINE SAFETY USA CORP. is a corporation organized and existing under the laws of DE that maintains an established place of business at 17146 Feather Craft Lane, Suite 200, Webster, TX, USA 77598.

**JURISDICTION**

4. This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

5. This Court has exclusive subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

6. This Court has personal jurisdiction over Defendant because it has engaged in systematic and continuous business activities in this District. As described below, Defendant has committed acts of patent infringement giving rise to this action within this District.

## VENUE

7. Venue is proper in this District under 28 U.S.C. § 1400(b) because Defendant has an established place of business in this District. In addition, Defendant has committed acts of patent infringement in this District, and Plaintiff has suffered harm in this district.

## PATENT-IN-SUIT

8. Plaintiff is the assignee of all right, title and interest in United States Patent No. 8,098,153 (the "Patent-in-Suit"); including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the Patent-in-Suit. Accordingly, Plaintiff possesses the exclusive right and standing to prosecute the present action for infringement of the Patent-in-Suit by Defendant.

## THE '153 PATENT

9. The '153 Patent is entitled "System and method of providing emergency response to a user carrying a user device," and issued 2012-01-17. The application leading to the '153 Patent was filed on 2007-10-31. A true and correct copy of the '153 Patent is attached hereto as Exhibit 1 and incorporated herein by reference.

10. Prior to the invention of the '153 Patent, conventional systems and methods for providing emergency response to users were ineffective and subject to significant technical limitations. These conventional systems, such as those connected directly to public switched telephone networks (PSTN), functioned merely as stationary speakerphones located in fixed positions within homes or buildings. As the '153 Patent observes, "[o]ne such method connects a

device to the public switched telephone network (PSTN) and the device acts as a speakerphone." '153 Patent, 1:29-31.

11. The conventional emergency response solutions of the prior art had several fundamental technological deficiencies. For example, conventional PSTN-based systems were designed to operate only within a specific fixed location, rendering them useless when the user was away from home or too far from the activation device. As the '153 Patent explains, "if the user encounters an emergency or incident at a distance far from the speakerphone, the user is not able to communicate the nature of the emergency to a human advisor." '153 Patent, 1:31-34. "Another limitation of the related [prior] art device is that the user cannot receive assistance if the user is not inside the home or is too far away to activate the device." *Id.* at 1:39-42.

12. Prior art emergency response methods were further limited by their inability to establish two-way communication between the user and emergency contacts or responders. Such limitations reduced their effectiveness, however, since when an emergency's nature was unknown, emergency personnel might be unnecessarily dispatched, resulting in wasted resources and decreased likelihood of system use. As the '153 Patent explains, "When the emergency is unknown, emergency personnel, such as police officers, may be called to respond, when such a response is not required. Therefore, the user will not activate their system for fear of being unable to communicate the nature of the emergency effectively and being embarrassed when emergency personnel arrive." '153 Patent, 1:36-39.

13. The conventional solutions of the prior art also lacked the technical capability to integrate with other systems or to leverage modern network communications protocols. The '153 Patent notes that while prior art systems could track users using GPS and "transmit the information to various contacts so that the contacts are able to track the user," these systems did

not "combine monitoring and tracking of the user with the user being able to notify contacts of emergency or incidents by establishing communication over the Internet." '153 Patent, 1:64-67.

14. Thus, prior to the invention, emergency response systems suffered from critical technical limitations in their architecture. Conventional systems employed single communication paths that created vulnerability points – e.g., if that specific communication path was unavailable, the entire emergency response mechanism would fail. As the '153 Patent explains, traditional systems were tied to fixed locations, with a device that "connects a device to the public switched telephone network (PSTN) and the device acts as a speakerphone." '153 Patent, 1:29-31. This architecture created a critical technical constraint: "if the user encounters an emergency or incident at a distance far from the speakerphone, the user is not able to communicate the nature of the emergency to a human advisor." *Id.*, 1:31-34.

15. To address these technical deficiencies of the prior art, the '153 Patent implements a novel and inventive technical architecture that integrates multiple communication pathways through a central monitoring database with a unique capability to intelligently select and switch between available communication channels. The specification describes how "the user device may detect the presence of either one of the cellular network or the cradle. If the cradle is detected, then the digital signal is transmitted via RF signals from the user device to the cradle and over the Internet. If the cradle is not detected, then the user device employs the cellular modem to access the cellular network." '153 Patent, 8:36-42. This multi-path communication architecture provides fallback mechanisms that were absent in conventional single-path systems of the prior art, creating a technically robust solution that addressed a major vulnerability of prior art systems.

16. Furthermore, the ’153 Patent addressed the technical problem of inefficient emergency notification by implementing an intelligent communication framework that stores and manages contact preferences, cycles through contacts based on priority, and adaptively selects communication methods based on contact preferences. The specification explains that “The monitoring database may attempt to notify the contact at a home telephone number, then a work telephone number, then a cellular telephone number, then a pager, and then by email. Additionally, each contact may have specified times that each number is the preferred contact and it may also depend upon the scenario or emergency.” ’153 Patent, 4:23-29. This technical architecture creates an automated communication intelligence layer that was absent in conventional systems, which lacked the capability to adaptively select contact methods or systematically attempt alternative contacts when primary contacts were unavailable.

17. The ’153 Patent further addressed these technological deficiencies by providing systems and methods for “providing emergency response to a user carrying a user device” with the capability to establish communication over the Internet using internet protocols (IP). ’153 Patent, 2:27-30. The invention recognized that emergency response could be improved through a mobile, user-carried device that could communicate bidirectionally with a central monitoring database using internet protocols.

18. To address the technical deficiencies of conventional systems and methods, and to provide enhanced emergency response capability, the ’153 Patent claims unconventional and inventive systems and methods implementing a multi-contact, priority-based notification system that maintains communication across the Internet. The claimed invention provides an approach that maintains responsiveness by utilizing “a monitoring database including an identification for a user device” and “storing in the monitoring database a plurality of contacts to be contacted in

response to the monitoring database receiving an alert from the user device and a plurality of contact methods." '153 Patent, Claim 1.

19. The systems and methods claimed in the '153 Patent represent an architectural advancement in emergency response technology by providing a mechanism that maintains functionality through a unique and inventive combination of internet protocols, mobile devices, and automated contact priority processing. The '153 Patent explains that "One advantage of the subject invention is that the monitoring database may notify the contact using either the PSTN or the Internet through the servers using VoIP, short message service (SMS), and the like, for those supported devices, such as the home telephone number, pager, email, etc." '153 Patent, 4:33-38. This approach provides a technical solution not available in conventional systems.

20. Rather than simply automating pre-existing processes, the '153 Patent claims specific implementations not previously available in the prior art, wherein an emergency response is improved through an inventive and unconventional approach utilizing internet protocols that improves response times and effectiveness while simultaneously enhancing user mobility. As the '153 Patent explains, the invention enables "the user to establish communication using internet protocols directly through the user device with the contact over the Internet. So long as the device is within arms reach, the user requests immediate assistance by notifying the monitoring database and the monitoring database assess the emergency and alert the contacts or emergency personnel." '153 Patent, 2:27-33.

21. The conventional wisdom in emergency response systems at the time of invention actively taught away from the integrated, internet-protocol-based approach claimed in the '153 Patent. Prior art emergency systems emphasized dedicated, single-purpose hardware connections like direct PSTN lines, based on a technical

belief that dedicated hardware lines provided greater reliability than internet-based connections. This approach resulted in systems specifically designed to operate through isolated, non-integrated communication channels.

22. In contrast to this conventional wisdom, the '153 Patent takes the technically unconventional approach of embracing internet protocols as the foundation for a more flexible and fault-tolerant emergency response architecture. Prior art systems also taught away from integrating multiple communication modalities and contact methods into a unified system. Conventional emergency systems typically operated through a single communication protocol—either voice-based or data-based, but not both integrated together. The ’153 Patent notes that while prior art systems could track users using GPS and “transmit the information to various contacts so that the contacts are able to track the user,” these systems did not “combine monitoring and tracking of the user with the user being able to notify contacts of emergency or incidents by establishing communication over the Internet.” ’153 Patent, 1:64-66. Thus, the ’153 Patent creates a heterogeneous communication infrastructure that integrates diverse communication protocols into a unified notification framework. The patent details how “One advantage of the subject invention is that the monitoring database may notify the contact using either the PSTN or the Internet through the servers using VoIP, short message service (SMS), and the like, for those supported devices, such as the home telephone number, pager, email, etc.” *Id.*, 4:33-38. By implementing a technical architecture capable of managing and utilizing multiple communication protocols simultaneously—including VoIP, SMS, email, and traditional telephone

networks—the invention achieves communication capabilities that transcend the limitations of any single protocol, creating a system more adaptable to various communication scenarios than was possible in prior art systems and methods.

23. The emergency response systems and methods claimed in the ’153 Patent improved emergency response technology by integrating a mobile user device with a centralized monitoring database via internet protocols to create a more robust and efficient emergency response framework that prior art solutions could not provide. As the ’153 Patent explains, the “invention overcome[s] the inadequacies that characterize the related art systems. The subject invention allows the user to establish communication using internet protocols directly through the user device with the contact over the Internet.” ’153 Patent, 2:26-30.

24. As the ’153 Patent explains, the invention provides significant technical advantages by using “Voice-over internet protocol (VoIP)” which “is increasingly being used for communication over the Internet instead of using the PSTN.” ’153 Patent, 1:62-63. The ’153 Patent specifies that “The use of the Internet to connect the user device and the monitoring database is of utmost importance. The use of the Internet reduces the cost of operating and maintaining such a system and allows for a wider variety of applications for the subject invention. Further, the Internet reduces human intervention such that the monitoring database fully automates the notification of contacts.” ’153 Patent, 9:35-43.

25. A further focus of the claimed advance is the prioritization of contacts and notification methods. The ’153 Patent’s intelligent notification process represents a concrete improvement over conventional emergency systems. As explained in the specification, “The monitoring database includes a list of contacts to be contacted in an emergency for each user of each user device. The contacts may be defined by the user and the list may be accessible through

any web-based application to allow the user to update or modify the list." '153 Patent, 4:12-17. The patent further explains that "After a predetermined number of attempts to one contact, the monitoring database may then proceed to the next contact and attempt to notify them of the incident or emergency." *Id.* at 4:30-35.

26. Moreover, the implementation of internet protocols for emergency communications provides a specific technological improvement over conventional systems by both enhancing mobility and maintaining reliable communication. The specification describes how, "[i]n order to transmit the digital signal, the user device may detect the presence of either one of the cellular network or the cradle. If the cradle is detected, then the digital signal is transmitted via RF signals from the user device to the cradle and over the Internet. If the cradle is not detected, then the user device employs the cellular modem to access the cellular network." '153 Patent, 8:36-42. This specific technical implementation represents a concrete improvement that increases emergency response effectiveness by preventing communication failures through redundant connection methods.

27. The '153 Patent explicitly explains the technical advantages of its bidirectional audio communication capability: "Another advantage of the subject invention is that bidirectional audio communication may be established between the user device and the contact responding utilizing VoIP. Therefore, when the contact is notified, the contact will be in immediate communication with the user through the user device. This is an improvement over related art systems that are connected directly to the PSTN. These related art systems connected to the PSTN act as a speakerphone such that if the user encounters an emergency or incident at a distance far from the speakerphone, the user is not be able to communicate the nature of the emergency to the human advisor." '153 Patent, 9:44-55.

28. The ’153 Patent implements a technically sophisticated communication escalation framework with an integrated feedback loop. The specification describes how “the monitoring database may then proceed to the next contact and attempt to notify them of the incident or emergency” after “a predetermined number of attempts to one contact.” ’153 Patent, 4:30-33. This automated escalation system includes a confirmation mechanism where “the monitoring database monitors the response of the contact and will continue notifying additional contacts until a response is confirmed by one of the contacts.” *Id.*, 9:30-33. This technical feedback loop creates an intelligent notification system that adapts its behavior based on response data—a capability absent in conventional static notification systems.

29. These inventive concepts are captured in several key limitations of Claim 1. The limitation requiring “automatically establishing communication with one of the contacts through one of the contact methods according to the priority order upon receipt of the alert” embodies the invention’s intelligent communication pathway selection, enabling the system to dynamically choose the appropriate contact method based on stored preferences rather than using a fixed communication channel. The claim’s requirement for “arranging the contacts and contact methods in a priority order determined by the user” captures the invention’s heterogeneous communication integration, allowing different notification methods to be organized in a structured hierarchy that accommodates various communication technologies. Further, the limitation “automatically establishing communication with another contact according to the priority order with the monitoring database until the monitoring database receives an accepted response” implements a critical technical feedback loop that enables adaptive notification escalation—a core technical improvement over the conventional, static notification systems of the prior art. This limitation requires the system to actively monitor for acceptance signals, make

intelligent decisions based on those signals, and continue the notification process when needed. Together, these elements of Claim 1 define a specific technical solution that goes far beyond conventional emergency systems and generic internet applications.

30. None of the methods or systems of the '153 Patent were previously performed by human beings, or capable of being performed in the human mind, as they necessarily involve complex computer systems communicating through internet network protocols to implement an automated emergency response system using multiple prioritized contacts and communication methods.

## COUNT 1: INFRINGEMENT OF THE ’153 PATENT

31. Plaintiff incorporates the above paragraphs herein by reference.

32. **Direct Infringement**. Defendant has been and continues to directly infringe one or more claims of the ’153 Patent in at least this District by making, using, offering to sell, selling and/or importing, without limitation, at least the Defendant products identified in the charts incorporated into this Count below (among the “Exemplary Defendant Products”) that infringe at least the exemplary claims of the ’153 Patent also identified in the charts incorporated into this Count below (the “Exemplary ’153 Patent Claims”) literally or by the doctrine of equivalents. On information and belief, numerous other devices that infringe the claims of the ’153 Patent have been made, used, sold, imported, and offered for sale by Defendant and/or its customers.

33. Defendant also has and continues to directly infringe, literally or under the doctrine of equivalents, the Exemplary ’153 Patent Claims, by having its employees internally test and use these Exemplary Products.

34. **Actual Knowledge of Infringement**. The service of the Original Complaint filed on January 27, 2025, in conjunction with the attached claim charts and references cited, constitutes actual knowledge of infringement as alleged here.

35. Despite such actual knowledge, Defendant continues to make, use, test, sell, offer for sale, market, and/or import into the United States, products that infringe the ’153 Patent. On information and belief, Defendant has also continued to sell the Exemplary Defendant Products and distribute product literature and website materials inducing end users and others to use its products in the customary and intended manner that infringes the ’153 Patent. See Exhibit 2 (extensively referencing these materials to demonstrate how they direct end users to commit patent infringement).

36. **Induced Infringement**. At least since being served by this Complaint and corresponding claim charts, Defendant has actively, knowingly, and intentionally continued to induce infringement of the ’153 Patent, literally or by the doctrine of equivalents, by selling Exemplary Defendant Products to their customers for use in end-user products in a manner that infringes one or more claims of the ’153 Patent.

37. Exhibit 2 includes charts comparing the Exemplary ’153 Patent Claims to the Exemplary Defendant Products. As set forth in these charts, the Exemplary Defendant Products practice the technology claimed by the ’153 Patent. Accordingly, the Exemplary Defendant Products incorporated in these charts satisfy all elements of the Exemplary ’153 Patent Claims.

38. Plaintiff therefore incorporates by reference in its allegations herein the claim charts of Exhibit 2.

39. Plaintiff is entitled to recover damages adequate to compensate for Defendant's infringement.

## JURY DEMAND

40. Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A. A judgment that the ’153 Patent is valid and enforceable

B. A judgment that Defendant has infringed directly and indirectly one or more claims of the ’153 Patent;

C. An accounting of all damages not presented at trial;

D. A judgment that awards Plaintiff all appropriate damages under 35 U.S.C. § 284 for Defendant's continuing or future infringement, up until the date such judgment is entered with respect to the ’153 Patent, including pre- or post-judgment interest, costs, and disbursements as justified under 35 U.S.C. § 284;

E. And, if necessary, to adequately compensate Plaintiff for Defendant's infringement, an accounting:

  i. that this case be declared exceptional within the meaning of 35 U.S.C. § 285 and that Plaintiff be awarded its reasonable attorneys fees against Defendant that it incurs in prosecuting this action;

  ii. that Plaintiff be awarded costs, and expenses that it incurs in prosecuting this action; and

  iii. that Plaintiff be awarded such further relief at law or in equity as the Court deems just and proper.

Dated: May 19, 2025

Respectfully submitted,

/s/ Antranig Garibian (DE Bar No. 4962)
Antranig Garibian (DE Bar No. 4962)
Garibian Law Offices, P.C.
1523 Concord Pike, Suite 400
Wilmington, DE 19803
(302) 722-6885
ag@garibianlaw.com

Isaac Rabicoff
Rabicoff Law LLC
(*Pro hac vice* application forthcoming)
4311 N Ravenswood Ave Suite 315
Chicago, IL 60613
7736694590
isaac@rabilaw.com

**Counsel for Plaintiff**
**Lattice Technologies LLC**